State, Long, pros., v. Mayor, &c., of Jersey City.

THE STATE, JOHN LONG, PROSECUTOR, v. THE MAYOR
AND ALDERMEN OF JERSEY CITY.

1. By the charter of Jersey City the board of aldermen are clothed with ample authority, not only to remove obstructions from their streets, but, as far as practicable, to guard against and prevent whatever obstructions may materially interfere with the free use of the street by the public.

2. An ordinance is merely the by-law of a municipal corporation, and is not exempt from the operation of the general principle that a by-law, to be good, must be reasonable; and whether it is reasonable or not, is a question for the court.

3. An ordinance prohibiting the standing of a railroad train directly across a public street longer than two minutes at one time, is not unreasonable.

On *certiorari* to one of the justices of the municipal court of Jersey City.

Argued at November Term, 1874, before Justices BEDLE, WOODHULL and VAN SYCKEL.

For the plaintiff in *certiorari*, Besson.

For the defendant, Lewis.

The opinion of the court was delivered by

WOODHULL, J. This writ brings up a certain judgment and proceedings before a justice of the municipal court of Jersey City, against the prosecutor, and also the ordinance whereon the same are founded.

The ordinance in question is entitled, "an ordinance to regulate the running of locomotives and horse cars through or across the streets of Jersey City," and was approved by the mayor of said city, August 4th, 1871.

Section 5 of the ordinance provides, "that the standing on the intersection, caused by the crossing of any street or thoroughfare by any railroad or track within the limits of Jersey City, of all locomotive or steam engines, cars, carriages, wagons, and vehicles of whatever kind, longer than two minutes at one time, shall be considered, and is hereby declared to be unlawful."

Section 8 provides, that any person who shall violate any provision of this ordinance shall, for every such offence, forfeit and pay the sum of $20.

Upon the closing of the testimony in the court below, the counsel for the defendant moved to dismiss the charge, on two grounds: 1. That there was no evidence in the case of the existence of a proper street at said intersection, laid out, dedicated and accepted by the public; and 2d, that the fifth section of said ordinance is void, because it is unreasonable, uncertain, and not warranted by any power given by the city charter.

The justice denied the motion to dismiss, and, having considered the evidence, adjudged the defendant guilty of a violation of said ordinance, and gave judgment against him in favor of the city, for the sum of $20, the amount of the prescribed penalty.

The reasons relied on here for the reversal of this judgment are the same that were urged in the court below on the motion to dismiss.

As was intimated to counsel on the argument, the first objection, namely, that there is no evidence in the case of the

existence of a proper street at the intersection, &c., does not appear to be well taken.

Campbell, the policeman, testifies that he arrested the defendant, Long, for allowing a train of railroad cars to stand upon the intersection caused by the crossing of Twelfth street by the railroad track, &c.

And he says further, that the street which the train crossed is flagged, curbed, and graded.

This is clearly sufficient, in the absence of any evidence to the contrary, to justify the inference that there was at the said intersection such a street as the ordinance and the city charter contemplate.

The other objections go to the validity of the fifth section of the ordinance, which is said to be unreasonable, uncertain, not warranted by the city charter, and therefore void.

I propose to inquire first as to the power of the mayor and aldermen of Jersey City, under their charter, to declare it to be unlawful for locomotives, steam engines, cars, &c., to be left standing longer than two minutes at one time on that part of any railroad or track which intersects or crosses any street or thoroughfare within the limits of said city.

Section 24 of an "act to re-organize the local government of Jersey City," passed March 31st, 1871, enacts, that the board of aldermen shall have power to pass, alter or repeal ordinances, to take effect within said city, for the following, among other purposes:

*Sixth.* To regulate and control the running of locomotive engines, dummy engines, and railroad cars through the streets and public places.

*Seventh.* To regulate, control or prohibit the passage through the streets and public places, of buildings and other large structures that materially interfere with the free use of the streets by the public.

*Eleventh.* To regulate the use of streets and public places by foot passengers, vehicles, railways and engines.

*Twelfth.* To regulate or prevent the use of streets for any other purposes than travel, &c.   *Laws*, 1871, *pp.* 1106, 1107.

The foregoing provisions were in force when the ordinance in question was passed, and they show very plainly, as it seems to me, that the legislature intended to clothe the board of aldermen of Jersey City with ample authority, not only to remove from their streets, but, as far as practicable, to guard against and prevent whatever obstructions may materially interfere with their free use by the public.

Assuming, for the present, that the provisions of section 5 of the ordinance are in themselves reasonable, the power to enact them may be fairly derived, either from sub-division 6, which authorizes the board of aldermen to regulate and control the running of locomotive engines, dummy engines and railroad cars, through the streets and public places; or from section 11, which gives them authority to regulate the use of streets and public places by foot passengers, vehicles, railways and engines.

Sub-divisions 7 and 12 are cited, not as sources of the power claimed by the city, but simply as showing the general purposes of the legislature, that the streets should be kept free for the use of the public, and, as safe guides to a proper interpretation of the others.

Having determined that the mayor and aldermen of Jersey City have authority, under the city charter, to pass a reasonable ordinance for the purpose of preventing the obstruction of the streets by railroad cars, the next question is as to the reasonableness of that part of the ordinance upon which these proceedings are founded.

That a by-law, to be good, must be reasonable, and that whether reasonable or not, is a question for the court, are familiar principles.

And as the ordinance in question is merely the by-law of a municipal corporation, it can be no more exempt from the operation of these principles than a by-law of any other corporation.

In determining whether an ordinance is reasonable or not, it has been well remarked that "the court will have regard to all the circumstances of the particular city or corporation,

the objects sought to be attained, and the necessity which exists for the ordinance. Regulations proper for a large and populous city might be absurd or oppressive in a small and sparsely populated town, or in the country." *Dill. Mun. Corp.* 283, § 261.

In view of the considerations just indicated, I am not prepared to say that section 5 of this ordinance is, in any respect, unreasonable.

The section in question, as we have seen, in substance, prohibits the standing of a railroad train directly across a public street longer than two minutes at one time.

The necessity for some such regulation in a city, within whose limits numerous railroad tracks are laid, running at grade through and across its streets, is too obvious to be questioned.

If not kept within reasonable limits by some competent controlling authority, these street obstructions by railroad trains would be sure to multiply and to become, in the end, an intolerable annoyance to the inhabitants.

The mayor and aldermen having, under their charter, ample power, it should be regarded as one of their chief duties, also, to secure to their citizens and others the free use of the public streets, by adopting and enforcing proper regulations to prevent or remove all unnecessary obstructions, and to restrict within the narrowest practicable limits such as may be sometimes necessary.

It was, no doubt, with a view to the fair performance of the delicate and difficult duty thus imposed upon them, that the ordinance before us was enacted by the board of aldermen.

The problem they had to deal with was so to adjust to each other two co-ordinate, and yet, under the existing circumstances of the city, partially conflicting rights, that the exercise of neither should be restrained beyond the limits of ordinary necessity.

The provisions of this ordinance so far from being conceived in a point of hostility to railroad corporations, plainly

imply and recognize the fact that both streets and railways are indispensable, and that neither, therefore, should be required to bear more than a just proportion of the inconvenience necessarily resulting from their relations to each other.

Section 5 proceeds upon the theory that in the usual course of railway business, when properly conducted, it is not ordinarily necessary that a train or a locomotive should be kept standing across a street longer than two minutes at any one time.

No attempt has been made, on the part of the prosecutor, to show by proof, nor is there in the case anything from which it can be fairly inferred that this theory is not well founded.

There can be no uncertainty, I think, as to the meaning of the section in question.

Its obvious design was to establish, not an inflexible rule applicable to all cases, but merely a general rule to be applied to cases occurring in the ordinary course of railway management, and, therefore, excluding all cases of actual necessity.

Understanding this to be the true meaning and purpose of the section in question, I think the judgment and proceedings of the court below should be affirmed.